## Commonwealth v. American Briquet Company.

*Taxation—Anthracite coal—Act of May 11, 1921.*

1. A manufactured product known as "briquets" is not taxable under the Act of May 11, 1921, P. L. 479.

2. The Act of May 11, 1921, P. L. 479, imposing a tax on anthracite coal, does not include a product manufactured according to a patented process, even though the basis of the product is culm, which is the screenings of anthracite coal.

Appeal for settlement for tax on anthracite coal. C. P. Dauphin Co., Com. Docket, 1922, No. 31.

*Philip S. Moyer*, Deputy Attorney-General, for plaintiff.

*Olmsted, Snyder & Miller* and *W. C. Mason*, for defendant.

HARGEST, P. J., Nov. 29, 1926.—On Oct. 17, 1922, this case was heard by the court, without the intervention of a jury, pursuant to the Act of April 22, 1874, P. L. 109, but briefs were only recently filed. The question involved is whether a manufactured product known as "briquets" is taxable under the

Commonwealth v. American Briquet Company.

Act of May 11, 1921, P. L. 479. The facts have been agreed upon by the parties in a stipulation filed, but, for convenience, we restate briefly those upon which our conclusion largely rests:

1. The appellant company operates a plant at Lykens, Dauphin County, Pa., near a large culm bank of the Susquehanna Collieries.

2. The appellant company manufactures, according to a patented process, briquets which are used for fuel.

3. The culm which forms the basis for the manufactured product is the refuse from the operation of the anthracite coal mines in the preparation of merchantable sizes of anthracite coal. There was no market for this culm as anthracite coal during the tax period from July 1 to Dec. 31, 1921.

4. The process of manufacturing is somewhat elaborate and considerable machinery is required. It is, briefly, as follows: The culm is put through a drier to remove the moisture, the dust is driven out and collected, the culm is then screened and the oversized culm crushed. All of the culm is conveyed to a bin and thereupon it is mixed by machinery with a binder, consisting of water, starch and asphalt, so that every particle of culm is coated with the binder. The product is then pressed into shape at a pressure of 5000 pounds to the square inch, and thereupon discharged from the press to a drier, containing several departments and various degrees of temperature, for the purpose of increasing the binding qualities of the starch and allowing the asphalt to harden, after which the briquets are conveyed to an elevation, then to a vibrating screen, where any breakages are eliminated and carried back to be used over again.

### Discussion.

The Act of May 11, 1921, P. L. 479, imposing a tax on anthracite coal, provides: "Each and every ton of anthracite coal, of the weight of two thousand two hundred and forty (2240) pounds avoirdupois, mined, washed, screened or otherwise prepared for market in this Commonwealth, shall be made subject to a tax of one and one-half (1½) per centum of the value thereof when prepared for market, which said tax shall be assessed at the time when said coal has been mined, washed or screened and is ready for shipment or market."

Section 2 of the act provides, in part: "It shall be the duty of the individual, or the superintendent or other officer in charge of any mine or mines, or washery, or operation, to assess the tax hereby imposed, from time to time, as the coal is mined, washed or screened and is ready for shipment or market, and to ascertain and assess daily the number of gross tons of coal so mined, washed or screened, and to fix the value thereof."

It will be seen at once that the tax is imposed upon "anthracite coal," and the precise question for determination is whether the briquets in question are anthracite coal within the meaning of this statute.

It is so well settled as to hardly need repetition that the power to tax is statutory, and only such subjects are taxed as are plainly within the terms of the statute (Com. v. Pennsylvania W. & P. Co., 271 Pa. 456, 458), and that a tax law cannot be extended by construction to things not described as the subjects of taxation: Boyd v. Hood, 57 Pa. 98. It follows that, to entitle the Commonwealth to the tax imposed, the words of the statute must be clear and unambiguous: Com. v. Brush E. L. Co., 204 Pa. 249, 252; Endlich on Interpretation of Statutes, § 345.

The words of the statute in question impose a tax upon anthracite coal. Does that include a product manufactured according to a patented process, even though the basis of the product is culm, which is the screenings of

anthracite coal? When we apply the legal principles above quoted, we think this question must be answered in the negative. The statute imposes the tax upon anthracite coal when it is "mined, washed, screened or otherwise prepared for market." The Commonwealth contends that the process to which the culm has been subjected is nothing more than preparing it for market. But the answer to that contention is two-fold. First, that the culm is not a marketable product. If the culm were subjected to a process which only removed the dust there would be considerable force to the Commonwealth's argument. Secondly, the culm is not only cleaned from dust, but is subjected to a somewhat elaborate process for the admixture of starch and asphalt and for pressing the briquets into shape to make a marketable product. The result is "a patent fuel." We think it is too clear to justify much further argument or the citation of many authorities that this "patent fuel" is not "anthracite coal" within the meaning of this taxing statute.

There are, however, two cases in point to which our attention has been called. In the English case of City of London v. Parkinson et al., 70 Eng. Com. Law Rep. (10 Common Bench Rep.) 227, the precise question was before the court. In that case, the question was whether a patented fuel, composed of coal-dust mixed with 13 per cent. of pitch and lime and compressed into bricks, was liable to duties imposed upon "coals" imported into the port of London under the statutes. It was shown that the product was made from the coal-dust or duff-coal, as it was called, and that that coal-dust or duff-coal was frequently used for making bricks for producing gas, so that it was, to some extent, marketable, and, to that extent, differs from culm in the instant case. It was also shown that ordinary coal could be used for every purpose for which this product was used. Wilde, C. J., delivering the opinion of the court, used this language, particularly applicable to the instant case (page 237):

"It is true that the patent fuel is composed chiefly of coal-dust; but, in order to make it merchantable as fuel, it is necessary to mix the coal-dust with a certain quantity of pitch and lime; and, although the proportions of those ingredients are small, as compared with the coal-dust, it is admitted that they were really necessary, and were not introduced for the purpose of evading the duty. And, although it may be true, as stated by the scientific witnesses examined on behalf of the plaintiffs, that there is no purpose to which ordinary pit-coal can be applied to which coal-dust could not also be applied, yet it is manifest that the latter would be applied at so great a disadvantage as to be almost worthless; whereas, mixed with the pitch and lime, and having undergone the process described in the case, it becomes for many purposes more valuable than ordinary coal. The fact, therefore, of the coal-dust being so applicable does not, in our opinion, decide the question.

"In construing the Act of Parliament imposing the duty, we must assume that the word 'coals' is used in its ordinary popular sense, and must see whether the article in question comes within its meaning according to that criterion.

"If a person were to order of a coal merchant a quantity of coals, would that order be complied with by the delivery of the patent fuel? Surely, no one would contend for the affirmative. Or, if a vendor were to contract to deliver coals of any description named by the purchaser, could he be called upon to deliver patent fuel? We apprehend that he could not."

The other case is Howard v. Great Western Ins. Co., 109 Mass. 384. This case was an effort to recover a loss upon a policy of marine insurance. In the policy the insured "warranted not to load more than her registered ton-

Commonwealth v. American Briquet Company.

nage with lead, marble, coal, slate," etc. The vessel loaded with more than her registered tonnage of "patent fuel." The question was whether the patent fuel was "coal" within the terms of the warranty. The court submitted to the jury whether, under commercial usage, the patent fuel was to be considered coal. The jury found that it was, and this finding was sustained. We are, however, convinced that the reasoning and conclusion of the English case is the correct one, and that the briquets in the instant case cannot be considered anthracite coal within the meaning of our taxing statute.

It is not necessary for us to discuss whether the language of the statute, "otherwise prepared for market," includes a preparation such as is resorted to in this case of changing the culm into briquets. The defendant argues that when the rules of ejusdem generis or noscitur a sociis are applied to the words "otherwise prepared for market," it is clear that those words would not include a process such as is resorted to in the manufacture of briquets, because that process is not related to the other words of the statute, "mined, washed, screened." The parties on each side have argued these questions at some length, but we base our conclusion on the broader ground that the words "anthracite coal," as used in the statute, do not include a "patent fuel" such as briquets.

Upon the trial of this case the court, of its own motion, indicated that it might be important to show what proportion, either in weight or volume, the asphalt and starch bore to the culm in the manufactured product, and it was suggested that that information be furnished as a part of the agreed statement of facts. Such information has not been furnished, but our conclusion makes it unnecessary. If the manufactured product cannot be considered "anthracite coal," then it makes no difference what proportion of asphalt and starch has gone into the product.

For these reasons judgment must be entered for the defendant.

Now, Nov. 29, 1926, judgment is hereby directed to be entered in favor of the American Briquet Company and against the Commonwealth, unless exceptions be filed within the time limited by law.

From George R. Barnett, Harrisburg, Pa.